NOT DESIGNATED FOR PUBLICATION

No. 122,330

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Marriage of

STEVI L. BOLES,
*Appellee*,

and

WOODROW BOLES JR.,
*Appellant*.

MEMORANDUM OPINION

Appeal from Thomas District Court; KEVIN BERENS, judge. Opinion filed February 26, 2021.
Affirmed.

*Jeffrey Leiker*, of Overland Park, for appellant.

*Charles A. Peckham*, of Brown, Creighton & Peckham, of Atwood, for appellee.

Before GARDNER, P.J., SCHROEDER, J., and WALKER, S.J.

PER CURIAM: Woodrow Boles, Jr. (Father) and Stevi Strick (f/k/a Stevi Boles) (Mother) married in 2011 and divorced in 2017. They were the natural parents of a boy and girl. In this appeal, Father argues the district court erred in denying his motion for a change in residential custody. The district court's denial was based on its determination that Father failed to establish a prima facie case of a material change of circumstances for the parties' children. But because the district court considered the appropriate statutory factors in coming to its conclusion, we find the district court did not abuse its discretion

1

when it dismissed Father's motion for a change of residential custody. Accordingly, we affirm the district court's dismissal of the motion.

FACTS

Father and Mother married in September 2011 and divorced in December 2016. Though the district court granted the decree of divorce in December 2016, it was not filed until February 2017. Mother and Father had two minor children when they divorced: one boy and one girl. Under the terms of the divorce decree, the parents had joint legal custody of the children with Mother being the residential custodian.

After the parties' divorce, Father bought a house and moved to Warrensburg, Missouri, sometime around June 2017. Hannah Marsh, Father's fiancée and later wife, lived with him in the house. At first, Mother lived in Colby, Kansas. Mother also had two other children, one boy and one girl, but Father was not the natural parent of either.

On September 12, 2017, Mother notified Father that she was moving from Colby to St. Francis, Kansas, because the rental property she lived in changed owners. Mother told Father she was told to vacate the premises by October 15, 2017. As a result of the move, the parties' meeting place to exchange the children would be approximately 90 miles further from the original meeting place.

On September 25, 2017, Father filed a motion objecting to Mother's proposed move and asked the district court to modify residential custody of the children. In the motion, Father alleged that Mother's planned move to St. Francis would not be in the best interests of the children because it would impact his parenting time with the children. Father also alleged the proposed move would increase the costs he would incur to exercise his right to parent the children. Father contended this would be Mother's seventh move since the two separated in April 2014, which he believed showed a continuing

2

instability in residences for the children. He asked the district court to modify the residential custody of the children because of a material change in circumstances. The district court subsequently held a two-day trial on the motion on August 29-30, 2018.

At the hearing, Father explained that, before the two separated, the family moved from Colby to Oregon because he found a higher paying job. While in Oregon, the two separated, and Mother returned to Kansas with the children. Father testified that Mother's move in October was her fifth move since the two separated. The first four moves consisted of Mother moving to different locations within Colby, but the fifth move was when she decided to move to St. Francis. Father also said that after returning from Oregon in 2015, he lived Overland Park, Kansas, then Lenexa, Kansas, before ultimately moving to Warrensburg in 2017. Despite his own moves, Father did not believe Mother's move to St. Francis was in the best interests of the children.

Father argued the move was not in the best interests of the children for multiple reasons. One of the issues was schooling. Father did not want the children pulled from the school they were attending in Colby. Father also argued that St. Francis, which is smaller than Colby, was further away from basic needs, like medical care, food, and schooling. Furthermore, Father was concerned with Mother's financial stability because he was not completely sure what she did for work. But Father was particularly concerned with the person he believed Mother was in a relationship with. Father did not know the exact nature of the relationship, but he alleged that the individual had an extensive criminal past and did not want the individual around the children because of that.

Mother testified that she lived in St. Francis and rented a home from Blake Feikert, who was the individual Father was concerned about. Mother lived in the house with her and Father's two children and her other daughter. Mother said her other son had lived with her previously but decided to go live with his father at the end of the school year in 2016. Her other son was 15 or 16 years old when he moved in with his father.

Mother testified that Feikert lived on the same property as she did but in a different house. Mother characterized Feikert as her landlord at the time of the hearing. She said that once she discovered his criminal history, she decided it was in the best interests of herself and her children to step back from the romantic relationship the two were in previously. When asked about what she discovered, Mother said she discovered allegations against Feikert, but she did not know if they were true. She also said she did a background check and did not discover anything wrong but still decided to step back from the relationship. Prior to learning about those allegations, Mother and Feikert had been in a relationship for approximately two years.

Mother testified she was not concerned about the safety of herself or her children because Feikert was hardly ever around. She estimated that she had only seen him four times between February 2018, when she ended the relationship, and the time of the hearing. Mother also spoke with Feikert's ex-wife about the allegations, and Feikert's ex-wife told Mother the allegations were not anything substantial. Mother said that Feikert was never alone with the children, and when he had seen them it was always in a group setting. She later clarified that Feikert had spent the night with her at her previous home but not at the one in St. Francis.

When asked why she moved in October 2017, Mother said she needed to get out of the house she was in previously because the roof leaked, there was mold, and the basement filled with water when it rained. She said she constantly contacted the landlords about the problems with the house but nothing ever got fixed. She said at the time, she ran a daycare and did not want to put her children or the other children in any risk. Mother also stated that part of the reason for her move was to find a more affordable house. After she moved to St. Francis, Mother stopped working as a daycare provider because she broke bones in her wrist, which prevented her from working. At the time of the hearing, Mother was self-employed as a dog groomer.

Between her job as a daycare provider and dog groomer, Mother also worked at a Dollar General store for about a month-and-a-half, but she stopped working there because she was not making enough money to support her and her children. She stated that she made substantially more money at her dog grooming business and planned to continue operating the business long-term. She also stated the dog grooming business afforded her far more flexibility in terms of scheduling than her previous job, which benefited her and her children.

Mother also addressed the schooling issue at the hearing. She testified that their son was enrolled in kindergarten in St. Francis. Prior to kindergarten, Mother planned on enrolling their son in Head Start, which was a preschool. However, that did not happen, partly due to the spot that was at one time available becoming unavailable. Instead, Mother decided to homeschool the children, including their daughter who was four years old at the time of the hearing, after she broke her wrist. Mother did not have a formal curriculum when teaching the children, but she worked on teaching the children reading and writing. When Mother eventually learned a spot opened at Head Start, she made the decision to continue teaching their children at home. Just before the hearing took place, Mother learned that their daughter had been waitlisted at Head Start. Mother planned on enrolling her if another spot became available.

Furthermore, Mother testified that the children still interacted with the friends they made in Colby despite having moved to St. Francis. She said they periodically went back to Colby to visit, or other people drove from Colby to St. Francis. Mother did not believe the travel distance impacted any of the children's friendships or activities in which they participated.

Mother also reiterated her belief that her move to St. Francis was a semi-permanent move. She said she hoped to be there for five years or potentially longer but did not elaborate on her reasoning for the five-year estimate. She did say she never felt

any of her moves to different residences in Colby were permanent because of bad rentals and bad landlords, which she believed was common in Colby. She felt that her rental in St. Francis was different because Feikert was a better landlord who would fix any issues that arose.

When asked more about Feikert, Mother stated he would only be around in group settings going forward. Mother explained that she and Feikert share some of the same friends, and the group of friends often went to the lake or camping. However, Mother did not plan on allowing Feikert to come to her residence to see the children. Mother was also notified about previous findings from the Kansas Department for Children and Families (DCF) concerning Feikert and his own children. When asked about the findings, Mother said she was concerned, but she also said she never had seen him exhibit any signs of dangerous behavior towards her or her children. She reiterated her belief that living on his property would not be unsafe after being asked about a shooting incident that took place at his house. Mother contended Feikert acted in self-defense when he shot an intruder and said the event took place more than a year before she moved into her residence. Mother said she still would have considered moving to the house she lived in even if she knew about Feikert's criminal history before moving there. At the time of the hearing, she said she had not finished reading through everything about his criminal history, but she did not think she would move after finishing because the two had a clear understanding about where they stood.

Mother later discussed the background report she got from the Kansas Bureau of Investigation (KBI). She ran the report in January 2017, after the two had been dating for a while, and it did not indicate Feikert had any records with the KBI. After being asked specifically about any previous charges or convictions Feikert had, Mother again said she relied on the KBI report, which did not reflect anything. Mother said Feikert did not have any criminal charges when the two were in a relationship.

Mother disagreed with Father's assertion that the children's best interests would be served by giving Father residential custody. She said the children had lived with her since they were born and would be taken out of their network if they moved, especially because their son had already started school and made friends. She also reiterated her belief that moving to St. Francis did not have a substantial impact on the children's normal activities in which they participated in Colby.

At the conclusion of the hearing, the district court concluded the evidence showed that both parents were good parents. However, the district court told both parents they had to do a better job of communicating with each other moving forward, reasoning that most of the problems in the case stemmed from a lack of conversation between them. The only individual the district court expressed any concern about with respect to being involved in the children's lives was Feikert. The district court also noted that both parents wished to be residential custodians and that the minor children were not of sufficient age or maturity to express their desires.

Later the same day, the district court entered an order regarding the hearing on Father's motion. The district court found that Mother's move from Colby to St. Francis did not substantially impact Father's parenting time and did not negatively impact the children's relationships with the parents, grandparents, friends, or other significant persons in their lives. Regarding Feikert, the district court concluded that Mother was not currently in a relationship with him and had shown a willingness to adjust her personal relationships to meet the best interests of the children. The district court also found that both parents would reliably meet the needs of the children going forward. Based on its findings, the district court denied Father's motion and ordered that Mother would retain primary residential custody of the children going forward.

In January 2019, Father filed a motion under K.S.A. 2019 Supp. 60-260(b)(2) and (b)(3) to reconsider the district court's order regarding his motion to modify. Specifically,

Father argued that Mother intentionally misled the district court about her relationship with Feikert. Father alleged that Mother and Feikert resumed their relationship and he had reassumed a parental role. Father also alleged that Mother falsely reported how their son broke his arm, that the children told Father that Mother and Feikert were physically disciplining them, that Mother told the children to lie to Father about Feikert's role in their lives, that their daughter was still not enrolled in preschool, and that Father had seen Feikert with his children on multiple occasions since the trial.

In response to Father's motion, the district court appointed Heather Alwin to serve as the guardian ad litem for the children. In May 2019 Alwin submitted her confidential report to the district court. In the report, Alwin concluded that Mother misrepresented her reasons for moving from Colby to St. Francis at the hearing in August 2018. While Mother told the district court she moved because the residence in St. Francis was cheaper than her residence in Colby, Alwin concluded that Mother moved to St. Francis to be with Feikert. Alwin also concluded that Mother did not have a job waiting for her at Head Start when she moved to St. Francis, which meant that Mother moved there without a source of income to provide for her and the children.

Alwin found that Mother also misled the district court about the extent of Feikert's involvement with the family while living in the residence on his property, stating that Feikert had a significant impact on the family for at least part of the time Mother and the children lived in her residence on the property. Alwin explained that Feikert's house had no running water, which meant that he often utilized the kitchen and other facilities in Mother's rental house when he was around. Alwin also believed that Mother's other daughter moved away, in part because she did not get along with Feikert.

Regarding the relationship between Feikert and Mother, Alwin determined that Mother did not tell Feikert she was taking a step back from the relationship. Instead, Feikert left the St. Francis area in the spring of 2018 and was gone for months. Alwin

found that Mother's "'step back'" from the relationship was the result of Feikert's absence instead of a decision by Mother to pause or end the relationship as she told the district court. As a result, Feikert was unaware the relationship between himself and Mother had ended until October 2018, when Mother ended the relationship. When Mother decided to end the relationship, she did so in the car after dropping the children off at the exchange location. Mother told Alwin she broke up with Feikert in the car because she wanted to talk to him in a neutral location about ending the relationship, in part because Feikert had started acting odd around Mother. This concerned Alwin because either Mother brought a dangerous person along on the ride to the exchange with her and her children, or Mother and Feikert resumed their relationship after Mother told the district court she was not planning to do so. After she broke up with Feikert, Mother told Alwin that she felt uncomfortable around Feikert because he did not handle it well.

Furthermore, Alwin concluded that Mother's living situation was not nearly as stable as she presented to the district court. As evidence, Alwin indicated that Mother began looking for new residences in May 2018 and had already moved in January 2019, but Mother also told Alwin she did not plan on staying in the residence she moved to in January. Alwin believed that Mother's reasons for moving from one house to another often varied, depending on who she was speaking with. Alwin also believed Mother's reasons were sometimes illogical. For instance, Mother told Alwin she moved from the residence on Feikert's property because her older daughter did not want to live in St. Francis, but when Mother looked for alternative residences, they were all located in St. Francis. Further, in October 2018 Mother told Alwin she planned to move away from the residence on Feikert's property but did not know where she would move to. At one point, Mother told Alwin she was considering moving to Goodland, Kansas, but she later told Alwin she planned on moving back to Colby.

Alwin ultimately recommended that the district court should designate Father as the primary residential custodian of the children because it was in the children's best

interests. Alwin believed that both Mother and Father were good parents who had strong bonds with the children. However, Alwin determined that Father's situation was more stable. Father had recently purchased a larger house down the street from his previous home in Warrensburg, but in contrast Mother's living situation was in constant turmoil. Father also had a stable job and income, whereas Mother indicated to Alwin on multiple occasions that she needed money, despite maintaining that her dog grooming business was doing well.

As a result of the report, the district court held another lengthy hearing in June 2019. At that time, Father had only filed his original motion for reconsideration. Thus, the only concern at the hearing was whether there was new evidence and whether Mother misrepresented the facts to the district court at the prior hearing.

After withdrawing from her role as guardian ad litem, Alwin testified at the hearing. Alwin testified that the district court appointed her primarily to investigate the issue of fraud or misrepresentation. Specifically, Alwin was to prepare a report outlining her findings about whether there were misrepresentations made at the hearing the district court held in August 2018.

When asked about Feikert, Alwin stated that she was somewhat familiar with his criminal history, including a substantiated DCF report about emotional abuse concerning his own children. She also spoke with Feikert during her investigation. She said that Feikert was not completely antagonistic, but he also told her that certain things were not her business, including his whereabouts when he left the St. Francis area in the spring of 2018 for a few months. Alwin's testimony concerning Feikert largely coincided with the findings in her report, as did her other testimony on the conclusions in her report.

However, as Mother points out in her brief, when asked specifically about her conclusions on cross-examination, Alwin testified she did not have any information about

whether Mother and Father's son lied about how he broke his arm, had no evidence that Mother or Feikert physically disciplined the children, no evidence that Feikert played a consistent role in the children's lives, and no evidence that Mother directed the children to lie to Father about Feikert's involvement in their lives. On the day of the hearing, not all the witnesses had a chance to testify before the end of the day. As a result, the district court continued the rest of the hearing until August.

Before the next scheduled hearing took place, Father filed an amended motion to reconsider in July. Father alleged that Mother was moving once again and had already purchased a home at the new location. Thus, Father alleged another material change in circumstances pursuant to K.S.A. 2019 Supp. 23-3222(c) and incorporated by reference the allegations he made in his earlier motion to reconsider. Later that month, the district court entered a pretrial order concerning the second hearing. The pretrial order stated that both parties agreed the trial concerned Father's allegations about the material change in circumstances. On August 12, the second day of testimony before the district court commenced.

Father testified that Mother had moved twice since the hearing in August 2018 and resided in Colby at the time of the hearing. Father believed her move from St. Francis to Colby negatively impacted their son's schooling situation because he was leaving the friends he made in St. Francis. Father stated that Mother informed him their daughter would be starting preschool that year.

Father also testified that when Mother moved back to Colby, she bought a mobile home instead of continuing to rent housing. The children shared a room, while Mother and her other daughter, who recently moved back in with Mother, each had their own room. Although Father expressed some concern about how much utilities would cost, he did not seem concerned about the children living in the mobile home. He did, however,

express concern surrounding the number of moves that occurred throughout the case because he felt the constant moving had a negative impact on the children.

Father also indicated that he moved in July of that year to a house down the street. Father's new house was larger than his other house and had rooms for each of the children. Father's parents moved into his old house, and they agreed to leave the children's old room, which they shared, exactly the way it was. Father testified that his parents played a large role in the children's lives whenever they were in town.

On cross-examination, Father was asked about his motion where he alleged a material change in circumstances. When asked about the effect of the move on the children, Father admitted that his son had friends in both St. Francis and Colby. Father also admitted that the move did not result in any increased costs for him to exercise his parenting time. It also did not negatively impact Father's parenting time. Furthermore, Father agreed that Mother's move away from Feikert's property in St. Francis was a good thing for the children. Father also admitted that Mother had worked as a dog groomer for approximately two years. Nonetheless, Father believed Mother's constant moving and financial instability negatively impacted the children.

Alwin also testified at the second hearing. Near the beginning of her testimony, Alwin testified about Mother's alleged misrepresentations, which was similar to what she previously testified to at the prior hearing in June. At this point Mother objected, arguing that Father had abandoned the issue of fraud and misrepresentation. The district court agreed, reasoning that any testimony about Mother's misrepresentations had been abandoned.

Alwin then testified once again about her conclusions in the report she prepared for the district court. Alwin reiterated her concerns with Mother's moves, and Mother's lack of planning before the moves. Alwin did not believe Mother's recent move back to

Colby seemed like a permanent solution. However, Alwin believed the children benefited from being reunited with Mother's older daughter because the daughter and children seemed to have a good relationship. Alwin also said she was concerned with Mother's financial stability because multiple witnesses told her Mother struggled with finances.

On cross-examination, Alwin admitted that Mother's financial situation improved from the time Mother originally moved to St. Francis to the time when Alwin completed her report. When asked about Mother moving residences, Alwin said that she did not believe Mother's moves were as justified as she led the district court to believe. Despite the district court previously finding that the moves were justified, Alwin maintained her belief that Mother often moved as a reaction to other things in her life without adequate planning. At the conclusion of her cross-examination, Alwin said that she was more concerned with the number of moves than with Mother moving the children back to Colby.

After Father rested his case, Mother argued the case should be dismissed because Father failed to demonstrate a prima facie case of a material change in circumstances. Mother contended that her move back to Colby did not make the prior custody decree unreasonable. She also argued that Father's motion lacked specificity and materiality. She believed that Father's motion was inadequate under K.S.A. 2019 Supp. 23-3222 and related caselaw, and she asked the district court to dismiss his motion as a result. Father stood on the testimony and arguments made in his motion, but he also reiterated facts concerning Mother's financial and residential instability. He asked the district court to allow the case to proceed so it could consider the guardian ad litem's recommendation.

Ultimately, the district court did not believe Father presented clear and convincing evidence that Mother perpetrated a fraud or intentionally misled the district court with her testimony in August 2018. With regard to the best interests of the children, the district court found that Mother's move away from Feikert's property in January 2019 benefited

13

all the parties involved, including Father. The move reunited the children with their half-sibling, returned the children to an area they were familiar with, and did not increase Father's expenses for visitation purposes. In sum, the district court did not believe Mother's move negatively affected the children's best interests. Accordingly, the district court dismissed Father's motion because he failed to demonstrate a prima facie case of a material change in circumstances. The district court also kept in place the previous parenting time arrangements because Father failed to demonstrate a material change in circumstances.

Father has timely appealed from the district court's denial of his motion to reconsider its earlier ruling and order a change of residential custody.

ANALYSIS

On appeal, Father argues the district court erred when it concluded he failed to present a prima facie case demonstrating a material change in circumstances and dismissed his motion. Father also argues the district court erred by failing to accept his factual allegations as true.

"Given the district court's unique vantage point of what is often an emotionally charged situation in child custody disputes, an appellate court generally will not overturn such decisions unless the court abused its discretion." *In re Marriage of Bahlmann*, 56 Kan. App. 2d 901, 903, 440 P.3d 597 (2019). In deciding whether the district court abused its discretion, appellate courts do not reweigh evidence, redetermine questions of fact, or pass on witness credibility. 56 Kan. App. 2d at 903-04.

To support his argument that the district court erred by failing to consider his factual allegations as true, Father cites the same cases as the appellant in *Bahlmann*. But

14

Father fails to acknowledge that the *Bahlmann* panel decided the issue adversely to his position. See 56 Kan. App. 2d at 904-05.

In *Bahlmann*, the parties divorced, and the district court issued temporary ex-parte orders for custody and parenting time in favor of the mother. The father later filed motions seeking to modify the ex-parte orders. After hearing arguments on the motion, the district court adopted the mother's parenting plan. Nevertheless, the parties continued to litigate custody after the district court issued its written decision. After more than a year from the date the district court issued its order, the father filed a motion to modify child custody, claiming a material change in circumstances. The mother filed a motion to dismiss the father's motion and denied that it would be in the children's best interests to live with the father. The district court ultimately dismissed the father's motion, finding that father failed to state specific facts and failed to show a material change in circumstances. The father appealed, arguing the district court erred when it failed to consider the factual allegations contained in his motion as true.

The *Bahlmann* panel disagreed with the father and concluded the district court had good reason not to consider the factual allegations in his motion to modify custody as true. Relying on K.S.A. 2019 Supp. 60-207(a) and (b), our court acknowledged that a motion is not a pleading. It also explained that the procedural posture of a posttrial motion to modify is different than a pretrial motion to dismiss because the district court had the opportunity to review the parties' pleadings and evidence presented at trial. Since there was a trial, the district court had the opportunity to weigh the evidence presented, make credibility determinations, and issue a final order. 56 Kan. App. 2d at 904-05. Thus, this court concluded that the posttrial motion was "more akin to the court dismissing [the appellant's] posttrial motion for a new trial based on newly discovered evidence than it is to a court dismissing a pleading before any evidence has been presented." 56 Kan. App. 2d at 905.

The situation here is very similar. After the hearing in August 2018, the district court ordered that Mother would retain primary residential custody of the children going forward. Father later filed two motions to modify, one in January 2019 and one in July 2019. After hearing two days of testimony related to Father's motions, the district court found that he failed to demonstrate a prima facie case for a material change in circumstances and granted Mother's motion to dismiss the case.

As previously mentioned, Father cites to the same civil cases as the appellant in *Bahlmann* to support his claim the district court applied the incorrect standard when evaluating the motion to dismiss. But those civil cases, where the court applied the standard Father asks for here, were "dismissed for failure to state a claim at the pleading stage before any evidence was presented." 56 Kan. App. 2d at 904. That is not the situation here. Accordingly, the district court did not err when it did not consider the factual allegations contained in Father's motion as true.

In *Bahlmann*, the panel went on to say that appellate courts exercise an unlimited review in determining whether a plaintiff presented a prima facie case. 56 Kan. App. 2d at 905. Thus, we exercise a de novo review of Father's motion. "A prima facie showing is one '[s]ufficient to establish a fact or raise a presumption unless disproved or rebutted; based on what seems to be true on first examination, even though it [may] later be proved to be untrue.'" 56 Kan. App. 2d at 905 (quoting Black's Law Dictionary 1382 [10th ed. 2014]).

The best interests of the children are the foremost concern in any custody determination. 56 Kan. App. 2d at 905-06. Under K.S.A. 2019 Supp. 23-3218(a), a district court "may change or modify any prior order of custody, residency, visitation and parenting time, when a material change of circumstances is shown." Any alleged change must be of a substantial and continuing nature to be considered a material change in circumstances. *Bahlmann*, 56 Kan. App. 2d at 907 (citing *In re Marriage of Whipp*, 265

16

Kan. 500, Syl. ¶ 3, 962 P.2d 1058 [1998]). "'A twofold policy underlies the material change in circumstance rule. First, a reasonable degree of stability in a child's important relationships contributes to the emotional, intellectual, and moral development of the child. Second, the court generally favors one-time adjudication of matters and opposes repetitive actions.' [Citations omitted.]" 56 Kan. App. 2d at 908.

In his July 2019 motion, Father asserted a material change in circumstances based on Mother's two relocations since the August 2018 hearing. On appeal, he again argues that Mother's relocations demonstrated a prima facie case for a material change in circumstances under K.S.A. 2019 Supp. 23-3222(c).

K.S.A. 2019 Supp. 23-3222(c) states:

"A change of the residence or the removal of a child as described in subsection (a) may be considered a material change of circumstances which justifies modification of a prior order of legal custody, residency, child support or parenting time. In determining any motion seeking a modification of a prior order based on change of residence or removal as described in (a), the court shall consider all factors the court deems appropriate including, but not limited to: (1) The effect of the move on the best interests of the child; (2) the effect of the move on any party having rights granted under this article; and (3) the increased cost the move will impose on any party seeking to exercise rights granted under this article."

Father asserts the district court did not adequately consider the factors outlined in the statute. He also asserts the district court ignored the findings of the guardian ad litem appointed in the case. But we are not persuaded by Father's argument.

Father devotes a large portion of his brief talking about Alwin's findings and the testimony she provided to the district court at the hearings. But her testimony and the

conclusions in her report primarily focused on whether Mother misled the court at the August 2018 hearing.

At the August 2019 hearing, Alwin began by testifying again about the conclusions in her report and the issue of misrepresentation, much like she did at the June 2019 hearing. At that point Mother objected, arguing that the issue of misrepresentation had been abandoned by Father. The district court agreed the issue had been abandoned and told Father to ask Alwin about how the moves constituted a material change in circumstances. It is unclear from the record on appeal exactly when Father abandoned that issue, but he acknowledged the issue of misrepresentation was either abandoned or mooted directly after the district court sustained Mother's objection. Presumably, Father's abandonment of the issue was agreed upon when the district court issued its pretrial order in July, after Father filed his amended motion to modify but before the second hearing, since the pretrial order stated that both parties agreed the upcoming trial concerned Father's allegations about the material change in circumstances.

Thus, the district court's lack of regard for some of Alwin's testimony was understandable, especially considering that Alwin testified multiple times to many of the same facts. Moreover, regarding the change of circumstances at the second hearing, Alwin admitted that Mother's financial situation improved from the time Mother originally moved to St. Francis to the time when Alwin completed her report. Alwin also said she was more concerned with the number of moves than with Mother moving the children back to Colby.

Father's own testimony at the second hearing in June 2019 also supports the district court's conclusion. Father testified that his son had friends in both St. Francis and Colby. Father also admitted that the move did not result in any increased costs for him to exercise his parenting time or negatively impact his parenting time. Furthermore, Father agreed that Mother's move away from Feikert's property in St. Francis was a good thing

for the children. Thus, under the second and third factors outlined in K.S.A. 2019 Supp. 23-3222(c), Father's own testimony demonstrates a lack of a prima facie case for a material change in circumstances. Put simply, Mother's relocations did not create any new hardship for Father, as he seems to acknowledge in his brief. In fact, Mother's relocation back to Colby shortened the distance between her and Father, meaning the children would have to spend less time in the car going to exchanges.

Regarding the first factor outlined in K.S.A. 2019 Supp. 23-3222(c), Father failed to make a prima facie case that the relocations negatively impacted the children. As the district court concluded, Mother's move away from Feikert's property in January 2019 benefited all the parties involved, including Father. The move also reunited the children with Mother's older daughter and returned the children to an area they were familiar with. In addition, Mother bought her newest residence instead of renting. In the past, the moves were often the result of a rent increase or problems with a rental house. By purchasing a home, Mother would no longer be faced with some of those problems.

Without question, most of the issues in the case stemmed from Mother and Father's inability to communicate with one another. At the conclusion of the August 2018 hearing, the district court told Mother and Father that they needed to communicate better. The district court also told them neither child was a reliable source of information based on their age and lack of maturity. However, both parents disregarded the district court's statements because they failed to improve their communication and continued to rely on their children as sources of information throughout the entire case, which greatly contributed to a general feeling of distrust among the parties.

But Father's contention that Mother's relocations demonstrated a material change in circumstances is not supported by the record on appeal. Since the district court relied on the statutory considerations outlined in K.S.A. 2019 Supp. 23-3222, it did not abuse

its discretion or err when it dismissed Father's motion. Accordingly, we affirm the district court's judgment.

Affirmed.